## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JENNIFER AUDETTE and ROBERT AUDETTE,

                          Plaintiffs,

v.

LAKE OF THE WOODS COUNTY; LAKE OF THE WOODS BOARD OF COMMISSIONERS; JAMES NORDLOF, *in his official capacity*; CODY HASBARGEN, *in his official capacity*; JOE GRUND, *in his official capacity*; JON WAIBEL, *in his official capacity*; and EDWARD ARNESON, *in his official capacity*,

                          Defendants.

Case No. 24-cv-944 (LMP/LIB)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Gregory M. Erickson, Benjamin Paul Lanari, and Maxwell D. Becker, **Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN**, for Plaintiffs.

Andrew A. Wolf and Paul D. Reuvers, **Iverson Reuvers, Bloomington, MN**, for Defendants.

       Plaintiffs Jennifer Audette ("Jennifer") and Robert Audette ("Robert") (collectively, the "Audettes")[1] constructed a large concrete driveway and ramp on their lakefront property in Lake of the Woods County (the "County") without securing proper permission from County officials. When the County and the Minnesota Department of Natural

---

[1]      To distinguish between the Audettes in this opinion, the Court uses their first names when necessary. No disrespect is intended in doing so.

Resources ("DNR") informed the Audettes that the concrete driveway and ramp violated county zoning ordinances and the Minnesota Wetland Conservation Act, the Audettes sought an after-the-fact conditional use permit from the Lake of the Woods Board of Commissioners (the "Board"), explaining that the ramp was necessary for Jennifer—who has multiple sclerosis—to access the lake.  The Board denied the Audettes a conditional use permit, so the Audettes sued the County, the Board, and members of the Board in their official capacities (collectively, "Defendants"), arguing that by denying the conditional use permit, Defendants discriminated against Jennifer on the basis of her disability and failed to offer a reasonable accommodation under Title II of the Americans with Disabilities Act ("ADA").  *See generally* ECF No. 1.  The Audettes and Defendants each move for summary judgment.  ECF Nos. 23, 31.  For the following reasons, Defendants' motion is granted, the Audettes' motion is denied, and the complaint is dismissed with prejudice.

## FACTUAL BACKGROUND[2]

The Audettes purchased a lakefront property in Williams, Minnesota, in September 2019, intending for that property to become their residence in retirement.  *See* ECF No. 28-1; ECF No. 34-1 at 17:22–25.  The Audettes sought to make certain improvements to the property, including installing a new septic system and constructing a larger garage.  ECF No. 27-2 at 10:12–18; ECF No. 28-3.  In June 2020, Robert submitted an application to the County seeking land use permits for a garage addition and a septic-system replacement.  *See* ECF No. 28-2.  The permit application did not indicate that the

---

[2]    This factual background includes only the necessary, undisputed facts in the summary-judgment record.

2

Audettes would be making any additional improvements to the property. *Id.* That same month, Robert met with County Land and Water Planning Director Josh Stromland ("Stromland") and Environmental Specialist Dane Lynch ("Lynch") to discuss improvements to the property. *See* ECF No. 28-3 at 2. During Stromland's and Lynch's visit to the property, the pair raised concerns that the garage addition and the installation of a new septic system would impact existing wetlands. *Id.* Stromland and Lynch advised Robert that the improvements to the property could not add more than 400 square feet of new fill to the property. *Id.* Robert told Stromland and Lynch that he planned to keep the amount of new fill under 400 square feet. *Id.* Accordingly, the County issued land use permits to Robert for the septic system installation and the garage addition project in June 2020 and September 2020, respectively. *See* ECF No. 28-4.

Between the fall of 2020 and the summer of 2021, the Audettes added onto their garage as expected, but they also added thousands of additional square feet of concrete to build a driveway and 12-foot-wide ramp down to the lake. *See* ECF No. 28-5; ECF No. 28-6. This unpermitted construction drew the attention of several governmental bodies, including the County, the DNR, and the Lake of the Woods Soil and Conservation District.

First, County officials inspected the Audettes' property in June 2021 after they caught wind of the construction. *See* ECF No. 28-5. In August 2021, Stromland sent a letter to Robert, explaining that the additional concrete work violated several provisions of the County's zoning ordinances. *See* ECF No. 28-8. The letter advised the Audettes that they had an opportunity to remedy the zoning violations by applying for an after-the-fact conditional use permit. *Id.* at 3.

3

Second, in July 2021 the DNR served the Audettes with a Restoration Order. *See* ECF No. 28-6. The Restoration Order explained that the Audettes' concrete work resulted in a 2,122-square-foot wetland impact and observed that the concrete "was placed without an approved replacement plan and no exemption would apply to this type of impact." *Id.* at 2. The Restoration Order concluded that the Audettes' concrete work violated the Minnesota Wetland Conservation Act and ordered the Audettes to restore the wetland to its pre-altered condition. *Id.* at 2–3.

Finally, the Lake of the Woods Soil and Water Conservation District found that the concrete ramp to the lake had destroyed the shoreline's riprap—heavy, jagged boulders[3]— which was installed as a conservation practice to stabilize the shoreline. *See* ECF No. 28-12. The previous owners of the Audettes' property had received $15,906 in financial assistance from the State to install the riprap, and state regulations provide that if the riprap is not maintained during its effective life, the landowners are responsible to refund to the State up to 150 percent of the financial assistance. *See id.* The Soil and Water Conservation District explained that it would consider imposing penalties on the Audettes if they did not restore the riprap to its pre-altered condition. *Id.* at 2.

In September 2021, Robert submitted an after-the-fact conditional use permit application to the County. *See* ECF No. 28-11. In providing a description of the proposed project, Robert wrote, "Construction of 12 ft. wide concrete boat ramp to the Ordinary

---

[3]    *See* Minn. Dep't of Nat. Res., *Shoreline Alterations: Riprap* (Mar. 2012), available at    https://files.dnr.state.mn.us/publications/waters/shoreline_alterations_riprap.pdf [https://perma.cc/AXE2-PFJA].

High-Water Level of Lake of the Woods.  See sketch for location.  The ramp will provide safe access to the lake for my family.  My wife's health is not good." *Id.* at 7.  The application also notes that the ramp "provides handicap accessibility to the lake for my wife.  It was built with access and safety in mind." *Id.* at 11.  Robert's reference to Jennifer's health referred to the fact that Jennifer was diagnosed with multiple sclerosis in 2017.  ECF No. 34-1 at 13:5–15:7.  Jennifer's multiple sclerosis causes her to experience fatigue, stress, headaches, and vertigo.  *Id.*  Prior to Robert's submission of the conditional use permit, the Audettes had not raised Jennifer's disability to the County as a justification for building the concrete ramp.

The County's Planning Commission held a hearing on the Audettes' conditional use permit application on November 3, 2021.  *See* ECF No. 28-13.  The Audettes' attorney explained to the Planning Commission that the main reason for the concrete additions were "because of [Jennifer's] health issues. She's got MS and they've bought that property and the only way that she's going to access the shoreline is through what he's done, that kind of work." ECF No. 28-13 at 3:22–4:4.  The Planning Commission expressed concern that the Audettes had installed much more concrete than they originally represented to the County, and that recommending the approval of the conditional use permit could encourage others in the community to forge ahead on construction projects without a permit and later seek an after-the-fact permit.  *See, e.g.*, *id.* at 4:23, 7:7–11, 10:9–25, 12:13–23.  Ultimately, however, the Planning Commission recommended approving the Audettes' application for a conditional use permit, provided that they "remove concrete from the northwest corner of garage to northeast corner of house deck with exception of 12 foot wide walkway

5

allowed to ordinary high water from ordinary high water to lake" and "use jointed concrete cable ties and [] replace rip rap to edge of concrete."  ECF No. 34-15 at 2.

On November 9, 2021, the Audettes' application for a conditional use permit came before the regular meeting of the Board, which had final authority to grant or deny the permit.  *See* ECF No. 28-16.  The Board recognized that the Audettes were seeking the permit for a 12-foot-wide ramp due, in part, to Jennifer's multiple sclerosis.  *See, e.g.*, *id.* at 2:17–19, 9:19–22.  However, the Board was troubled by the Audettes' decision to proceed on the concrete work without seeking proper permission.  *See, e.g.*, *id.* at 6:11–12, 36:1–3 ("This is an egregious enough violation.  Right?  I mean you gave him a permit to do certain things, and he went way beyond the scope of those."), 38:13–39:2.  Like the Planning Commission, the Board was also concerned that approving the Audettes' permit application would open a "can of worms" by encouraging community members to construct improvements without a permit and later seek forgiveness from the County.  *See id.* at 7:7–8:14, 11:1–11.  And although the Board recognized Jennifer's accessibility needs, *see, e.g.*, *id.* at 8:24–9:5, some members of the Board were concerned that the concrete work on the Audettes' property was inconsistent with the County's Comprehensive Land Use Policy and would impact sedimentation, erosion, and water quality, *see, e.g.*, *id.* at 25:6–8, 30:25–31:2, 34:18–35:2, 39:3–9.

Ultimately, the Board denied the Audettes' application for a conditional use permit, providing the following reasons in support of its denial:

The nutrient impairment of Lake of the Woods.

Shoreland stabilization projects to prevent further erosion of shoreline which reduces or eliminates sedimentation and excess nutrients entering Lake of the Woods.

The applicant didn't follow process/protocol and is an egregious violation of the Lake of the Woods County Zoning Ordinance. The applicant was aware of process/protocols in place as two previous permits were applied for and approved for the installation of septic system and addition onto the existing garage.

Applicant sought project assistance from the Land and Water Planning Office as noted in the file from a site visit to the property in June 10, 2020 but, went ahead without the required approvals.

Alternative solutions to gain access to the lake exist that would be more environmentally friendly while still allowing the rock rip rap to remain intact and still allowing access . . . ; however, applicant didn't seek project assistance from the Land and Water Planning Office prior to undertaking the project.

ECF No. 28-17 at 4–5. The Board required the Audettes to restore the property to "original conditions as existed prior to the project occurring" and required the riprap to be "restored to the previous engineered standards" by no later than July 31, 2022. *Id.* at 5.

On July 15, 2022—two weeks before the Audettes were supposed to have completed restoration of the concrete work—the Audettes submitted a Joint Application Form to the Lake of the Woods Land and Water Planning Office, which is required for projects "that may affect a water resource," such as wetlands. ECF No. 34-12 at 1. The Audettes' proposal sought to maintain the concrete work, as the "concrete is crucial and the area surrounding needs to remain unharmed" due to "ADA compliant accommodation for family members with disabilities." *Id.* at 5. The Audettes proposed various options to comply with the Wetlands Conservation Act, including purchasing wetland credits, a fine, repurposing wetland areas, or removing a portion of the ramp. *Id.* at 3. In August 2022,

the Land and Water Planning Office denied the Audettes' Joint Application, finding that their proposals did "little to reduce the overall wetland impacts to accomplish the project and no alternatives were identified."  ECF No. 28-22 at 3.  The Land and Water Planning Office also noted that the project would still be in violation of County zoning ordinances, even if it complied with the Wetland Conservation Act.  *Id.*  Further negotiations between the County and the Audettes were unsuccessful, ECF Nos. 28-24, 28-25, 28-27, 28-29 at 11:12–12:3, so the Audettes eventually appealed the denial of their Joint Application to the Minnesota Board of Water and Soil Resources, ECF No. 28-33.  The Board of Water and Soil Resources denied the Audettes' appeal on April 24, 2023.  *Id.* at 6.

After the Board of Water and Soil Resources denied their appeal, the Audettes did not commence any restoration work during the spring, summer, or fall of 2023.  *See* ECF Nos. 28-34, 28-35.  As a result, the construction remained in violation of the County's order to restore the property to its pre-altered condition and the DNR's Restoration Order.  On September 16, 2023, the DNR cited the Audettes for violations of, and failure to comply with, the Restoration Order.  *Id.*

On March 14, 2024, the Audettes brought this action against Defendants, alleging that the Board failed to reasonably accommodate Jennifer's disability under the ADA by denying the Audettes' conditional use permit application.  *See* ECF No. 1 ¶¶ 57–63.  The Audettes now move for summary judgment, arguing that there is no genuine dispute of material fact that the Board failed to reasonably accommodate Jennifer's disability.  *See* ECF Nos. 31, 33.  Defendants also move for summary judgment, arguing that the Audettes' ADA claim fails on multiple fronts, including that the claim is untimely, the Audettes failed

8

to clearly communicate their request for a reasonable accommodation, and that the Audettes' requested accommodation—maintaining a 12-foot-wide concrete ramp to the lake—is unreasonable as a matter of law. *See* ECF Nos. 23, 26.

## ANALYSIS

Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted) (internal quotation marks omitted). At this procedural juncture, this Court does "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted) (internal quotation marks omitted). Additionally, the Court must view the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I.    ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity includes the County and its Board. *See id.* § 12131(1) (defining "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). A plaintiff alleging discrimination under Title II of the ADA may premise their case on three different theories: disparate treatment, disparate impact, or

failure to accommodate. *See One Love Hous., LLC v. City of Anoka*, 93 F.4th 424, 435 (8th Cir. 2024). Although the bulk of the Audettes' briefing centers on a failure-to-accommodate theory, their complaint and briefing also could be construed to raise a disparate treatment claim.[4] In the interest of completeness, the Court will address both legal theories.

### a. Failure To Accommodate

"In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). In other words, "[f]ailing to make a reasonable accommodation constitutes discrimination." *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022). The plaintiff ultimately bears the burden to show that the requested accommodation is reasonable. *See One Love Hous.*, 93 F.4th at 432–33.

But, of course, a requested accommodation must be *reasonable*. *See id.* at 432. And "[a] requested accommodation that simply excuses past misconduct is unreasonable as a matter of law." *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). When a person's request for an accommodation comes only after disciplinary action is imminent,

---

[4] Although the Audettes do not appear to move for summary judgment on their disparate treatment claim, Defendants move for summary judgment on that claim. ECF No. 26 at 34–36. The Audettes responded to that argument in their opposition brief, ECF No. 40 at 32–33, so the issue is ripe for this Court's adjudication.

such a request is "too little, too late." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) (citation omitted).

It does not appear that the Eighth Circuit has applied the "too little, too late" rule in the Title II context, but it has applied the rule in the employment-discrimination context under Title I of the ADA. *See Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (holding an employee's request for an accommodation due to drowsiness was "untimely" when it was requested only after the employee had fallen asleep on the job); *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) (citation omitted) (in the employment context, explaining that liability under the ADA "is not established where an employee engages in misconduct, learns of an impending adverse employment action, and then informs his employer of a disability that is the supposed cause of the prior misconduct and requests an accommodation"). And other courts have explicitly applied that approach to the Title II context. *See, e.g.*, *McElwee*, 700 F.3d at 641; *Profita v. Regents of the Univ. of Colo.*, 709 F. App'x 917, 920–21 (10th Cir. 2017); *Alvarez v. Sch. Bd. of Broward Cnty.*, 208 F. Supp. 3d 1281, 1283, 1285–86 (S.D. Fla. 2016); *Angelika P. v. Town of Meredith*, No. 19-cv-1114-SM, 2022 WL 706849, at *10 (D.N.H. Mar. 9, 2022); *Qiu v. Univ. of Cincinnati*, No. 1:18-cv-634, 2019 WL 2396664, at *4 (S.D. Ohio June 6, 2019).

Such application seems particularly warranted in the zoning context under Title II, given that property owners likely have the ability to be more deliberative and proactive in their request for an accommodation compared to employees, who often operate within a dynamic workplace environment. Moreover, unlike the employee-employer relationship,

the property owner-government relationship is a formal relationship between a regulated party and a regulator charged with enforcing the law. Property owners should therefore fully expect that they cannot stampede over zoning ordinances and environmental laws without first engaging with the entities responsible for enforcement of those rules. *Cf. Women's Kan. City St. Andrew Soc'y v. Kansas City*, 58 F.2d 593, 598 (8th Cir. 1932) ("Zoning laws rest upon the police power of the states, and, when they are fairly within the well-recognized bounds of such power they are valid, even though they may entail some hardship upon property owners."); *Becker v. City of Hillsboro*, 125 F.4th 844, 855 (8th Cir. 2025) ("[T]he property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures [] enacted by the State in legitimate exercise of its police powers.").

The Audettes distinguish cases under Title I of the ADA as "incompatible" in the Title II context, "primarily because cases concerning employee misconduct have no bearing on ADA cases dealing with accessibility, since after-the-fact conditional use permits are not comparable to 'misconduct' as described in the employment context." ECF No. 40 at 30. That argument is too clever by half. To be clear, exercising one's legitimate rights under the ADA in requesting accommodations is not misconduct. That is not what the Audettes did. The relevant misconduct here is *not* the Audettes' request for a reasonable accommodation by applying for a conditional use permit. Rather, the misconduct is what necessitated the conditional use permit in the first place—namely, the Audettes' decision to build a concrete driveway and ramp without proper authorization and in violation of County zoning ordinances and the Minnesota Wetland Conservation Act. ECF No. 28-6;

12

ECF No. 28-8; ECF No. 28-11 at 7, 11. Other than that argumentative sleight of hand, the Audettes provide no reason that Title I case law does not apply to the Title II context presented here.

The Audettes next liken this case to *Kulin v. Deschutes County*, 872 F. Supp. 2d 1093 (D. Or. 2012), but that case is poles apart from this one. In *Kulin*, the plaintiff, a landowner with a visual impairment, constructed a warehouse on his property and applied for an after-the-fact conditional use permit after he was notified that the warehouse violated the county's housing code. *Id.* at 1096. Crucially, however, the plaintiff "had obtained planning and building permits" to construct the warehouse. *Id.* The Court agreed with the plaintiff that additional storage space created by the warehouse was a reasonable accommodation to the plaintiff's disability, but central to that determination was the Court's finding that the plaintiff was not "somehow at fault for the [defendant's] issuance of the permit and his subsequent reliance on the permit when he invested funds in the storage addition." *Id.* at 1103. There, the plaintiff had sought permission first and then acted as the ADA authorizes.

Unlike the plaintiff in *Kulin*, the Audettes did not receive a permit to complete the entire concrete driveway and ramp project. Rather, Robert represented to the County that the new concrete fill to expand his garage would not exceed 400 square feet, and the County issued permits based on that representation. ECF No. 28-3 at 2; ECF No. 28-4. Indisputably, the Audettes did not adhere to that representation, so *Kulin* is unavailing for their position.

13

The Court is persuaded by the case law applying the "too little, too late" rule in the Title II context. And applying that rule here disposes of this case. Assuming that the Audettes properly requested an accommodation for Jennifer's disability in their September 2021 conditional use permit application, it is undisputed that the request for accommodations was made only *after* the Audettes had completed the unpermitted concrete work, and only *after* the Audettes were informed by County and state officials that the concrete work violated County zoning ordinances and the Minnesota Wetland Conservation Act. *See* ECF No. 28-6 (July 2021 Restoration Order from the DNR); ECF No. 28-8 (August 2021 letter explaining that the concrete work violated County zoning ordinances); ECF No. 28-11 at 7, 11 (September 2021 conditional use permit application, seeking accommodation for Jennifer). Never have the Audettes disputed that the unpermitted concrete work violated County zoning ordinances and the Minnesota Wetland Conservation Act. Their request for an accommodation, which came only *after* the Audettes faced adverse action for their unpermitted concrete work, came "too little, too late." *Jones*, 696 F.3d at 90.

That conclusion makes good sense here. After all, as the Audettes recognize, *see* ECF No. 40 at 15, the whole point of the reasonable-accommodation requirement of the ADA is to foster an interactive, cooperative dialogue to explore the existence and feasibility of reasonable accommodations. *See Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 915 (8th Cir. 2013). As the County explains, its existing zoning ordinances authorize the construction of a four-foot-wide ramp to the lakeshore and provide that ramps, lifts, and mobility paths may be authorized as a conditional use for individuals with physical

14

handicaps to achieve access to a lake's shore areas. *See* ECF No. 28 ¶ 22.  Had the Audettes sought to discuss Jennifer's accessibility needs with the County prior to constructing the concrete ramp, the Audettes may have reached a compromise with the County and even received the accommodation that they now seek after-the-fact. *Cf. Oxford House-C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir. 1996) (explaining under the Fair Housing Act ("FHA") that plaintiffs seeking a reasonable accommodation "must give the [government] a chance to accommodate them through the [government's] established procedures for adjusting the zoning code").[5]  But instead of giving the County a chance through a cooperative dialogue or the variance process, the Audettes chose not to inform the County of their plans and unilaterally moved ahead with constructing the concrete driveway and ramp.  The Audettes were free to make that decision, but it is a decision from which the ADA offers no refuge.  *See One Love Hous.*, 93 F.4th at 433 (citation omitted) (cleaned up) ("[T]he failure to apply for a zoning waiver or exception is fatal to a reasonable

---

[5]    "Courts considering claims relating to housing disputes analyze FHA and ADA disability discrimination claims 'as one.'"  *One Love Hous.*, 93 F.4th at 429 (citation omitted).

accommodation claim."). The Audettes' failure-to-accommodate claim is therefore dismissed.[6]

### b.    Disparate Treatment

An allegation of disparate treatment requires a showing of "discriminatory intent." *Peebles*, 354 F.3d at 766. A party may prove intentional discrimination under the ADA either by direct or indirect evidence. *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018). Direct evidence is that which shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse [] action." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (citation omitted). If direct evidence of discrimination does not exist, then "a plaintiff must rely on indirect evidence to prove intentional discrimination under the ADA," and the Court applies the burden-shifting framework from *McDonnell Douglas*. *Lipp*, 911 F.3d at 544 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

### i.    Whether the Audettes Have Provided Direct Evidence

The Audettes claim that they have provided direct evidence of discrimination by the Board. They point to several comments made by Board members during the hearings on the Audettes' conditional use permit application, ECF No. 40 at 33, but the Audettes'

---

[6]    Given the untimeliness of the Audettes' request for a reasonable accommodation, the Court need not address Defendants' remaining arguments that the Audettes did not clearly communicate their request for a reasonable accommodation and that the requested accommodation of a 12-foot-wide concrete ramp to the lake was not necessary to accommodate Jennifer's current disability.

cherry-picked comments are so plainly taken out of context.  *See Brousard-Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 978–79 (8th Cir. 1991) (chiding party for taking summary-judgment evidence "out of context" in attempting to establish a prima facie case of disability discrimination).  For example, the Audettes state that one of the Board members referred to the concrete ramp as an "amusement park," which purportedly signals a "cruel comparison" between Jennifer's accessibility needs and a "carnival ride."  ECF No. 40 at 33.  But the full context of that statement reveals that the Board member made that comment not in reference to Jennifer's disability but out of a concern that if the Audettes could disregard the County's rules and regulations, make no effort to comply with the law or receive proper permission, build whatever they wanted, and simply ask for a permit at the back end, there would be no limit to what others might build:

> I'm sure it's not the end of it, but like I said, my biggest fear in this thing is the trickledown effect. . . .  [P]eople that maybe have tried to get things and they say no and then all of a sudden—You don't want to give the people the free for all to just go do it. . . . [Like] [a]n amusement park.

ECF No. 28-16 at 20:16–21:1.

Other comments cited by the Audettes similarly reflect hostility not toward Jennifer's disability, but toward the Audettes' decision to flout the County's zoning rules and the precedent it might set, which does not establish a "specific link between the alleged discriminatory animus [toward Jennifer's multiple sclerosis] and the challenged decision." *St. Martin*, 680 F.3d at 1033.  A Board member's reference to "insider trading" plainly referred to the sentiment that individuals who profit from insider trading often get away with a slap on the wrist—a concern the Board member felt would apply equally to the

Audettes' decision to seek after-the-fact forgiveness from the County.  *See* ECF No. 28-16 at 11:1–4.  And a Board member's comparison of the Audettes' conduct to a foreign exchange student drinking underage centered on the Board member's belief that ignorance of the law was no excuse to the Audettes' conduct.  *See id.* at 35:4–12.  And another Board member's comment about getting the "go around" on obtaining a ramp reflected concern with circumventing the County's zoning rules.  *See id.* at 11:5–6.  Simply put, although the comments by the Board cited by the Audettes may demonstrate hostility to the Audettes, no reasonable trier of fact could determine that the challenged comments demonstrate hostility *on the basis of Jennifer's disability*.  Because the Audettes fail to point to comments by the Board that reasonably show "a specific link between the alleged discriminatory animus and the challenged decision," the Audettes must satisfy the burden-shifting framework under *McDonnell Douglas*.  *St. Martin*, 680 F.3d at 1033.

### ii.      Application of Burden-Shifting Framework

As an initial matter, the Audettes have only argued that they succeed under the direct-evidence test; they do not respond to Defendants' argument that the Audettes fail to satisfy the *McDonnell Douglas* burden-shifting framework.  *See* ECF No. 26 at 35–36; ECF No. 40 at 32–33.  That alone warrants summary judgment for Defendants on the Audettes' disparate treatment claim.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

The result would be the same even if the Court elected to consider the merits of the Audettes' disparate treatment claim.  *McDonnell Douglas* requires a plaintiff bringing a

disparate treatment claim under Title II of the ADA to first "establish a prima facie case of discrimination" by showing that (1) she is a person with a disability as defined by statute; (2) she is otherwise qualified for the benefit in question; and (3) she was excluded from the benefit due to discrimination based upon disability. *Power v. Univ. of N.D. Sch. of L.*, 954 F.3d 1047, 1052 (8th Cir. 2020) (citation omitted). If the plaintiff establishes a prima facie case of discrimination, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason" for the adverse action. *Id.* If the defendant can make such a showing, then the burden shifts back to the plaintiff, who must raise a genuine issue of material fact as to whether the defendant's purported legitimate explanation is actually a pretext for disability discrimination. *See id.* at 1053.

The Court assumes without deciding that the Audettes have made a prima facie case of discrimination. The burden then shifts to Defendants to "articulate a legitimate, nondiscriminatory reason" for denying the conditional use permit application. *Id.* at 1052. Defendants easily meet that burden, which is "not heavy." *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019). The Board's findings of fact and conclusions denying the Audettes' conditional use permit application cite environmental concerns (such as "nutrient impairment of Lake of the Woods" and "further erosion of shoreline") and the Audettes' willful and "egregious" failure to follow County zoning ordinances as the bases for its denial. ECF No. 28-17 at 4–5. Both of these rationales are legitimate and nondiscriminatory. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012) (plaintiff's misconduct was a legitimate and nondiscriminatory reason for his termination); *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1227 (2d

Cir. 1994) (holding, in the context of a racial discrimination claim under the Equal Protection Clause, that it was a "perfectly legitimate goal" to make zoning decisions based on "legitimate environmental concerns").

The burden then shifts back to the Audettes to raise a genuine dispute of material fact over whether Defendants' legitimate explanations are, in reality, a pretext for disability discrimination. *See Power*, 954 F.3d at 1053. Even viewing the summary-judgment record in the light most favorable to the Audettes, *Matsushita*, 475 U.S. at 587, the Audettes fail to do so.

The Audettes first point to comments by the Board members that purportedly show "prevalent" and "outright discriminatory animus," ECF No. 33 at 22–23, 39, but as discussed above, the Audettes take those comments grossly out of context. In fact, those comments all relate to the Board members' discussion of the Audettes' willful and "egregious" failure to follow County zoning ordinances, ECF No. 28-17 at 4–5, which is a legitimate, nondiscriminatory reason for denying the conditional use permit application, *Pulczinski*, 691 F.3d at 1004. The Audettes also assert that the Board's findings of fact make no mention of Jennifer's disability, ECF No. 33 at 15, but this is not true: the Board's decision recognizes the interest in providing "access to the lake," but notes that other options were more "environmentally friendly," and that the Audettes never sought project assistance from the County prior to installing the concrete work, ECF No. 28-17 at 4–5. Both of these rationales—concerns about the environment and violations of the County's zoning ordinances—are legitimate and nondiscriminatory. *See Pulczinski*, 691 F.3d at 1004; *Kirkpatrick*, 21 F.3d at 1227. And the Audettes' suggestion that "[Jennifer's]

20

disability is not mentioned even one time by any Board members present at the meeting," ECF No. 33 at 14, is flatly contradicted by their own brief and record citations, which show that "the Board w[as] noticed of [Jennifer's] need for accommodation at several junctures," ECF No. 33 at 9.

Finally, the Audettes suggest that the Board "drummed up reasons to justify its decision after the fact," pointing to statements by Board members that suggest that the Board was coming up with reasons on the fly to deny the Audettes' conditional use permit application. ECF No. 33 at 34–35. Even accepting the reasonableness of that interpretation of the Board members' statements, the Audettes still do not explain how the Board's allegedly flawed rationale reasonably reflects a pretext *for disability discrimination*. *See Power*, 954 F.3d at 1053 (explaining that the pretext requirement demands that the plaintiff show that "disability discrimination, and not [the defendant's] stated reasons, motivated" the adverse action). If the Board's decision was pretextual, but for a motivation unrelated to disability discrimination, liability does not exist under the ADA. *See Beasley*, 933 F.3d at 939 (explaining that pretext must reflect disparate treatment "on account of" a protected trait, and that treatment that "might have been unfair or disproportionate" is insufficient to demonstrate pretext). It is perhaps possible that the Board simply wanted to punish the Audettes for their "egregious" violations of the County's zoning ordinances, and therefore "drummed up" their concerns about the environment. But assuming that is true, the Audettes were treated differently for their violations of the law, not on account of Jennifer's

disability.  Only the latter is proscribed by the ADA, so the Audettes' disparate treatment claim must be dismissed.  *See id.*

<u>**CONCLUSION**</u>

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Motion for Summary Judgment (ECF No. 31) is **DENIED**.

2.    Defendants' Motion for Summary Judgment (ECF No. 23) is **GRANTED**.

3.    The complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 23, 2025                              *s/Laura M. Provinzino*
                                                          Laura M. Provinzino
                                                          United States District Judge